## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| RONALD SASLOW, ELLEN SASLOW, and THERESA SPENCER, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 22-cv-4063 |
| v. | ) ) | Hon. Steven C. Seeger |
| BANKERS STANDARD INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is about insurance coverage for a car accident. Plaintiff Ronald Saslow was driving a rental car in Arizona when a truck crossed the median and crashed into him. Saslow suffered serious injuries. So did his passenger, Plaintiff Theresa Spencer.

The driver of the truck that hit Saslow, Zacharia Bredeson, was working for Berry Brothers Firewood Company at the time of the accident. Ronald Saslow, his wife (Ellen Saslow), and Spencer later reached a $1 million settlement with Berry Brothers Firewood's insurer, EMC Insurance.

Ronald Saslow also obtained a payment from his own insurer, Defendant Bankers Standard Insurance Company. The Saslows had two policies with Bankers Standard, an auto policy and an umbrella policy. The auto policy included a coverage limit of $100,000 for medical expenses, and a coverage limit of $500,000 for uninsured/underinsured motorists. The umbrella policy had a coverage limit of $1 million.

Bankers Standard paid Ronald Saslow $100,000 for his medical expenses under the auto policy, plus $1 million under the umbrella policy. Bankers Standard also paid $89,528.01 to Spencer for her medical expenses.

The Saslows and Spencer believe that the policies entitle them to more money. Their theory primarily involves something called "stacking," where coverage is combined (or "stacked") when a policy or policies cover more than one vehicle. The basic idea is that if a policy provides coverage for medical expenses of, say, $100,000 per person, and covers three vehicles, then the insured can recover $300,000 (not merely $100,000).

The concept of stacking underlies Plaintiffs' theories of recovery. Based on stacking, Plaintiffs seek a greater recovery for medical expenses, and they seek to recover under the coverage for uninsured/underinsured motorists, too. And based on stacking, the Saslows also seek a greater recovery under the umbrella policy.

On top of it all, the Saslows and Spencer also claim that they are entitled to damages under the Illinois Insurance Code. They allege that Bankers Standard dragged its feet to fork over the funds, and is liable for vexatious and unreasonable delay.

The parties conducted discovery. Then, they filed cross motions for summary judgment.

For the reasons explained below, Defendant's motion for summary judgment is granted in large part and denied in small part. Plaintiffs' motion for summary judgment is denied.

## Non-Compliance with the Local Rules

Before diving into the facts, the Court must start with the requirements for motions for summary judgment under the Local Rules. The punchline is that Plaintiffs did not comply with the Local Rules.

Local Rule 56.1 establishes the procedure for filing and opposing a motion for summary judgment. The moving party must provide a "statement of material facts that complies with LR 56.1(d) and that attaches the cited evidentiary material." *See* L.R. 56.1(a)(2). That statement of facts must rest on evidence in the record, with user-friendly citations. "Each asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." *See* L.R. 56.1(d)(2).

Bankers Standard complied with Local Rule 56.1 by filing a statement of facts in support of its motion for summary judgment. *See* Def.'s Statement of Facts (Dckt. No. 71). And Plaintiffs filed a statement of facts that complied with Local Rule 56.1, too. *See* Pls.' Statement of Facts (Dckt. No. 72-3). So far, so good – for both sides.

In response to a statement of facts, the opposing party must file (1) a memorandum of law; and (2) a response to the "LR 56.1(a)(2) statement of material facts that complies with LR 56.1(e)[.]" *See* L.R. 56.1(b)(2). The response to the movant's statement of facts must "consist of numbered paragraphs corresponding to the numbered paragraphs" in the movant's statement of facts. *See* L.R. 56.1(e)(1).

Basically, the Local Rules require the non-movant to respond, paragraph by paragraph, to the facts in the movant's statement of facts. And if the non-movant disagrees with any of the movant's facts, the non-movant must cite evidence in the record to back up its position.

Summary judgment is the put-up-or-shut-up, smoke-'em-if-you-got-'em, speak-now-or-forever-hold-your-peace time. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). Now's the time to put your cards on the table.

A response to a motion for summary judgment must enable a district court to figure out if there is any *there* there. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir.

2015) ("The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination. It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact.").

A failure to respond to a statement of fact has straightforward consequences. "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *See* L.R. 56.1(e)(3).

Here, Bankers Standard submitted a response to Plaintiffs' statement of facts that complied with Local Rule 56.1. *See* Def.'s Resp. to Pls.' Statement of Facts (Dckt. No. 80). But on the flipside, Plaintiffs filed nothing. Plaintiffs did not respond to Bankers Standard's statement of facts – at all.

Plaintiffs' failure to follow the Local Rules does not end there, either. The Local Rules allow the non-moving party to add facts to the record by filing a statement of additional material facts. *See* L.R. 56.1(b)(3). The process for a statement of additional facts is basically the same as the process for a statement of facts.

The consequences of a failure to respond are the same, too. Facts in a statement of additional material facts "will be deemed admitted unless controverted by the statement of the moving party." *See* L.R. 56.1(e)(3).

In response to Plaintiffs' motion for summary judgment, Bankers Standard filed a statement of additional facts that complied with Local Rule 56.1. *See* Def.'s Statement of Additional Facts (Dckt. No. 81). But Plaintiffs did not respond to Bankers Standard's statement of additional facts.

Bankers Standard asks the Court to deem admitted each of the facts asserted in its statement of facts and statement of additional facts. *See* Def.'s Reply in Supp. of Def.'s Mtn. for Summ. J., at 6 (Dckt. No. 88). That request is reasonable. The Court can and will accept any properly supported facts in the two statements of facts filed by Bankers Standard.

Failing to comply with the Local Rules has predictable consequences. When a non-movant fails to respond to a motion for summary judgment, a district court can accept as true the facts set forth in the movant's statement. *See* L.R. 56.1(e)(3); *see also Hinterberger v. City of Indianapolis*, 966 F.3d 523, 528 (7th Cir. 2020) (opining that the Seventh Circuit has "recognized time and again" that "district courts may require strict compliance with their local rules").

The Local Rules exist for a reason. Each judge in this district has hundreds of pending motions in hundreds of cases, including who-knows-how-many motions for summary judgment. Motions for summary judgment are a heavy lift, consuming more than their fair share of judicial resources. The volume and complexity of the filings require compliance with the Local Rules. Otherwise, things can get unmanageable, fast.

Courts try to function like a well-oiled machine, and compliance with the Federal Rules and the Local Rules goes a long way to grease the wheels. But the wheels of justice can come off if parties go their own way, disregard the procedures, and follow their own set of rules.

Oftentimes, parties fail to comply with the Local Rules because they're proceeding *pro se*. After all, figuring out the legal process is a daunting task for a non-attorney. But that's not this case. Plaintiffs are represented by counsel, but failed to abide by the Local Rules.

So, the Court will deem admitted each of the facts submitted by Bankers Standard, to the extent that each fact has a citation to evidence in the record. *See Ballard v. Harmston*, 2024 WL

942424, at *2 n.1 (N.D. Ill. 2024); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012) ("Because Keeton failed to file a response to Morningstar's Local Rule 56.1 statement of facts in the district court, we credit Morningstar's uncontroverted version of the facts to the extent that it is supported by evidence in the record.") (citing *FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005)).

The same principle applies to Bankers Standard's statement of additional facts. *See Nadeem v. Viscosity Oil Co.*, 2024 WL 1283701, at *1 n.2 (N.D. Ill. 2024) (deeming admitted the facts in plaintiff's statement of additional facts because defendant failed to respond). The Court will deem admitted each fact from the statement of additional facts that Bankers Standard supported with a citation to evidence in the record.[1]

That said, Plaintiffs complied with Local Rule 56.1 when preparing their *own* statement of facts, meaning the statement in support of their motion for summary judgment. Plaintiffs offered properly supported facts in their statement of facts that may differ from the facts set forth by Bankers Standard in its statements.

To the extent that a properly supported fact from Plaintiffs' statement of facts contradicts a properly supported fact from Bankers Standard's statement of facts, the Court will consider the fact disputed. (That is generous given that it requires extra work for the Court.)

The Court will ignore any factual assertions made by Plaintiffs outside their statement of facts. And to the extent that Plaintiffs' statement of facts didn't address facts that Bankers Standard supported with evidence in the record, the Court will take Bankers Standard's version of the facts as true.

---

[1] In any event, as far as the Court can tell, the facts asserted by Bankers Standard in its statement of facts are largely identical to the facts asserted by Bankers Standard in its statement of additional facts. *Compare, e.g.*, Def.'s Statement of Facts, at ¶ 2 (Dckt. No. 71), *with* Def.'s Statement of Additional Facts, at ¶ 1 (Dckt. No. 81).

## Background

### I. The Accident

In October 2020, Ronald Saslow got in a car accident. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 6 (Dckt. No. 80). Saslow was driving a 2019 Cadillac Escalade in Phoenix, Arizona. *Id.* The Escalade was a rental car.[2] Theresa Spencer was a passenger in Saslow's vehicle. *Id.*

Disaster struck. Saslow's Escalade collided with a 2006 Isuzu truck driven by Zacharia Bredeson. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 6 (Dckt. No. 80).

Bredeson worked for Berry Brothers Firewood Co., a firewood supplier. *Id.* at ¶ 7. He was on the clock at the time of the accident. *Id.* The police report indicated that Bredeson's truck crossed the median and struck Saslow's vehicle. *See* Def.'s Statement of Facts, at ¶ 2 (Dckt. No. 71).

Sergio Encinas Levya was a passenger in Bredeson's truck. *Id.* at ¶ 2. Saslow and Spencer stipulated that they would not testify about their firsthand knowledge of Levya's actions "in causing or contributing to the accident." *Id.* at ¶ 8. In other words, Levya wasn't a tortfeasor. (That's important for insurance coverage.)

Saslow and Spencer survived the crash, but they did not come out unscathed. Unfortunately, Saslow was injured and incurred more than $100,000 in medical bills. *Id.* at ¶ 9. Spencer suffered injuries and had medical expenses, too. *Id.* at ¶ 10.

---

[2] The parties do not address the fact that the car in question was a rental car, not a car owned by Ronald Saslow. Even so, auto policies tend to cover rental cars. The Court assumes that the auto policy in question had such a provision, too, but the parties don't cite it. In any event, the parties don't place any importance on the fact that the car was a rental car, so this Court won't either.

At the time of the accident, Saslow and his wife (Ellen Saslow) had two insurance policies with Bankers Standard Insurance Company. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶¶ 10, 12 (Dckt. No. 80). They had an auto policy, and an umbrella policy. *Id.*

Berry Brothers Firewood had insurance, too. *Id.* at ¶ 8. EMC Insurance Companies had issued that company a policy with $1 million in combined single limits. *Id.*

## II.     The Settlement with Bredeson & Berry Brothers Firewood

The Saslows and Spencer agreed to settle their claims against Bredeson and divvy up the $1 million from the EMC Insurance policy. *Id.* at ¶ 9; *see also* Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 71). The Saslows would receive $879,832.23. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 9 (Dckt. No. 80). Spencer would get $100,000. *Id.*

Counsel for the Saslows and Spencer requested permission from Bankers Standard to enter into the proposed settlement and fully release Bredeson (again, the other driver) and Berry Brothers Firewood. *Id.* Bankers Standard agreed to accept the settlement and provide the release. *Id.*; *see also* Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 71).

The settlement with EMC Insurance went forward. The Saslows received $879,832.23. *See* Def.'s Statement of Facts, at ¶ 14 (Dckt. No. 71). Spencer got $100,000. *Id.* The remainder of the $1 million from EMC Insurance went to claimants involved in the accident who are not parties to this lawsuit. *Id.* at ¶ 15.

## III.    The Bankers Standard Insurance Policies

Again, Ronald and Ellen Saslow had an auto policy, and an umbrella policy, from Bankers Standard at the time of the accident. Each policy provided different coverage. Ultimately, Plaintiffs sought coverage under both policies.

The Court will provide an overview of the auto policy, and then the umbrella policy. The summary will address what they covered, who they covered, and how much coverage they provided.

### A. The Auto Policy

The Court will start with the auto policy. The punchline is that the auto policy provided $100,000 in medical expense coverage, and $500,000 in uninsured/underinsured motorist coverage.

Ronald Saslow paid an $8,470 premium for the auto policy. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 39 (Dckt. No. 80). The gross amount of the premium included premiums to cover five different vehicles: a 2016 Dodge Challenger ($1,539), a 2018 Acura RDX ($814), a 2019 Acura RDX ($3,287), a 2019 Tesla Model X ($2,119), and a 2008 Tesla Roadster ($711). *Id.* at ¶ 42.

The auto policy had medical expense coverage with a $100,000 limit. *Id.* at ¶ 43. Saslow paid premiums for medical coverage on three of the five vehicles: $37 for the 2016 Dodge Challenger, $21 for the 2018 Acura RDX, and $95 for the 2019 Acura RDX. *Id.* at ¶¶ 44–46. For whatever reason, Saslow did not pay premiums for medical expense coverage for the other two cars (meaning the two Teslas).

The auto policy explained the scope of coverage for medical expenses. On a page titled "**LIABILITY AND MEDICAL EXPENSES**," a subheading is titled "**MEDICAL EXPENSES**." *See* Auto Policy, at 41 (Dckt. No. 1-1) (emphasis in original). That subheading provided: "In addition to liability coverage, *we'll* pay reasonable *medical expenses* for certain people injured in a *vehicle accident* . . . ." *Id.* (emphasis in original). The policy contained bullet points listing various covered expenses, including "fees for doctors, surgeons dentists and nurses;

hospital and ambulance costs; charges for X-rays and artificial limbs or organs; and funeral expenses." *Id.*

The policy emphasized the limits of coverage, too. "But *we'll* pay only those reasonable expenses incurred within three years of the date of the *vehicle accident*. By paying these expenses, *we* don't admit any legal liability." *Id.* (emphasis in original).

The policy also shed light on whose medical expenses would be covered. "For *bodily injury* from an *occurrence* involving a motor vehicle, *we'll* pay *medical expenses* for anyone who is an *insured person*. Under this coverage, *insured person* includes the same people as under *your* liability coverage. In addition, *insured person* also includes any other person while occupying any other vehicle operated by *you* or a *family member*, if the vehicle is a private passenger auto or *trailer*." *Id.* at 54 (emphasis in original).

In addition to medical expense coverage, the auto policy provided uninsured/underinsured motorists coverage with a $500,000 limit. *Id.* at 44; *see also* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 47 (Dckt. No. 80). Saslow paid a premium for the uninsured/underinsured motorists coverage on each of the five vehicles: $122 for the Challenger and $106 (each) for the two Acuras and the two Teslas. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶¶ 48–52.

The policy explained the scope of uninsured/underinsured motorist coverage on a page titled "**UNINSURED/UNDERINSURED MOTORISTS COVERAGE**." *See* Auto Policy, at 44 (Dckt. No. 1-1) (emphasis in original). "This section tells *you* how *we* cover damages that *you* or a *family member* are entitled to collect from the owner or operator of a vehicle that doesn't have enough insurance." *Id.* (emphasis in original).

Under a subheading titled "**WHAT WE COVER**," the policy stated that Bankers Standard will "pay damages that an *insured person* is legally entitled to collect from the owner or operator of an *uninsured vehicle* because of *bodily injury* arising out of a *vehicle accident*." *Id.* (emphasis in original).

The policy defined an "insured person" and an "uninsured vehicle" when it came to uninsured and underinsured drivers.

An "insured person" included (1) the insured; (2) a family member; (3) "any other person occupying a vehicle described under 'Who we insure' in the liability section of 'Your Liability Coverage;'" or (4) "any person for damages that the person is entitled to recover because of *bodily injury* to which this coverage applies and which is sustained by *you,* a *family member,* or a person described immediately above." *See* Auto Policy, at 44 (Dckt. No. 1-1) (emphasis in original); Def.'s Statement of Facts, at ¶ 33 (Dckt. No. 71).

The policy contained an Illinois auto endorsement that modified the definition of insured person to include passengers. *See* Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 71). The endorsement added "any other person occupying any other auto operated by *you*." *See* Auto Policy, at 55 (Dckt. No. 1-1) (emphasis in original).

The policy defined an "uninsured vehicle" to include situations where there is *no* coverage, or *not enough* coverage. An "uninsured vehicle" includes a vehicle that (1) is not covered by a policy for bodily injury; (2) is covered, but "the coverage limit is less than *your* limit for this coverage;" (3) is covered, but the insurer declines coverage or goes bankrupt; or (4) is driven by a hit-and-run driver. *See* Auto Policy, at 44 (Dckt. No. 1-1) (emphasis in original).

For present purposes, the second part of that definition is most important. A vehicle is an "uninsured vehicle" if the driver of that vehicle has *less* coverage than the amount of coverage provided by the Bankers Standard policy.

So, if the other driver had $750,000 in coverage for bodily injury, then that driver would not count as the driver of an "uninsured vehicle," because the Bankers Standard policy had $500,000 in uninsured/underinsured motorist coverage. That's because $750,000 is not "less than" $500,000, meaning the amount of uninsured/underinsured motorist coverage in the Saslows' policy. That reality is true even if the insured suffered $1,500,000 in medical expenses.

The Illinois auto endorsement also imposed a limit on coverage when the insured receives payment as part of coverage for medical expenses. *See* Def.'s Statement of Facts, at ¶ 38 (Dckt. No. 71). "The limit of liability for underinsured motorists coverage shall be reduced by all sums [p]aid or payable because of the bodily injury under any automobile medical payments coverage. This includes all sums paid under the Medical Expenses section of this policy." *See* Auto Policy, at 56 (Dckt. No. 1-1) (cleaned up). In other words, if an insured received $X for medical expenses, the insured's payment for uninsured/underinsured motorist coverage would be reduced by $X.

The endorsement provided that "duplicate payments for the same elements of loss" are not permitted under the medical expenses and uninsured/underinsured motorists coverage provisions of the policy. *Id.*

The auto policy imposed "coverage limits." *See* Def.'s Statement of Facts, at ¶ 21 (Dckt. No. 71). The policy defined a "coverage limit" as "the most [Bankers Standard] will pay for an occurrence or loss." *Id.* at ¶¶ 21–22. It stated that "[e]ach title of coverage has its own limit,

shown on the Declarations Page." *See id.*; *see also* Auto Policy, at 45 (Dckt. No. 1-1). (More on the declarations pages momentarily.)

The auto policy also explained how much Bankers Standard would pay for a covered loss in certain scenarios. The "Terms and Conditions" section of the auto policy contained a subheading titled "**HOW MUCH WE'LL PAY**." *Id.* at 45 (emphasis in original). That section contained a subheading titled "**YOUR LIABILITY COVERAGE**," which addressed how much Bankers Standard would "pay for an *occurrence* covered by *your* liability, *medical expenses* or uninsured motorists coverage." *Id.* at 46 (emphasis in original).

For covered medical expenses, Bankers Standard would "pay up to *your medical expenses coverage limit.* That is the most *we'll* pay for each person injured in any one *vehicle accident*, no matter how many people or vehicles were involved." *Id.* (emphasis in original).

For uninsured/underinsured motorists coverage, Bankers Standard would "pay up to *your coverage limit* for that coverage. That is the most *we'll* pay for each *occurrence*, no matter how many people or vehicles were involved." *Id.* (emphasis in original).

The auto policy included a section called declarations, which spanned a few pages. In an insurance policy, the declarations section "states the parties to the contract, the policy period, the amount of insurance for each coverage (Limits of Liability), the premium charges, and the person or property insured." See 1 Holmes's Appleman on Insurance 2d § 4.4 (1996).

The auto policy in question included several versions of the declarations. Bankers Standard issued a new version of the declarations each time the insureds changed the covered vehicles or drivers. *See* Def.'s Statement of Facts, at ¶ 23 (Dckt. No. 71).

The declarations in effect on the date of the accident spanned several pages in the auto policy. *See* Auto Policy, at 118–24 (Dckt. No. 1-1). That's where the coverage limits come

from, meaning the $100,000 for medical expenses and $500,000 for uninsured/underinsured motorists coverage. Those numbers appeared on two different pages. *See id.* at 119–20.

The first page listed two covered vehicles (the 2016 Dodge Challenger and the 2018 Acura RDX). *Id.* at 119. The second page identified the three other covered vehicles (the 2019 Acura RDX, the 2019 Tesla Model X, and the 2008 Tesla Roadster). *Id.* at 120.

Basically, each page had a section entitled "COVERED VEHICLE DESCRIPTION." The first page listed the Dodge Challenger and the 2018 Acura RDX. The second page listed the 2019 Acura RDX and the two Teslas. *Id.* at 119–20.

Then, each page had a section entitled "COVERAGE DESCRIPTION," followed by the phrase "COVERAGE IS PROVIDED WHERE A COVERAGE LIMIT OR PREMIUM IS SHOWN FOR THE COVERAGE." *Id.* Each page listed coverage of $100,000 for medical expenses, and $500,000 for uninsured/underinsured motorists. *Id.*

The relevant portion of the first page of the declarations stated as follows:

| COVERED VEHICLE DESCRIPTION | | | | | | |
|---|---|---|---|---|---|---|
| VEH | YEAR | MAKE | MODEL | VIN | DEDUCTIBLE COMP | COLL |
| 7 | 2016 | DODGE | CHALLENGER | 2C3CDZBT6GH283740 | 1000 | 1000 |
| 8 | 2018 | ACURA | RDX | 5J8TB4H77JL009294 | 1000 | 1000 |

| COVERAGE DESCRIPTION | COVERAGE LIMIT | PREMIUMS | |
|---|---|---|---|
| COVERAGE IS PROVIDED WHERE A COVERAGE LIMIT OR PREMIUM IS SHOWN FOR THE COVERAGE | | | |
| | | VEH 7 | VEH 8 |
| LIABILITY | 500,000 | 633.00 | 360.00 |
| UNINSURED/UNDERINSURED MOTORISTS | 500,000 | 122.00 | 106.00 |
| MEDICAL EXPENSES | 100,000 | 37.00 | 21.00 |
| COMPREHENSIVE - FULL GLASS | | 94.00 | 39.00 |
| COLLISION | | 640.00 | 252.00 |
| OPTIONAL COVERAGES PREMIUM | | 13.00 | 36.00 |
| VEHICLE PREMIUM | | 1539.00 | 814.00 |
| TOTAL ANNUAL AUTO PREMIUM | $8,470.00 | | |
| ADDITIONAL PREMIUM | $350.00 | | |

*Id.* at 119.

The relevant portion of the second page of the declarations stated as follows:

| COVERED VEHICLE DESCRIPTION | | | | | | |
|---|---|---|---|---|---|---|
| VEH | YEAR | MAKE | MODEL | VIN | DEDUCTIBLE COMP | COLL |
| 9 | 2019 | ACURA | RDX | 5J8TC2H77KL026504 | 1000 | 1000 |
| 10 | 2019 | TESLA | MODEL X | 5YJXCBE42KF203280 | 1000 | 1000 |
| 11 | 2008 | TESLA | ROADSTER | 5YJRE11B381000258 | 1000 | 1000 |

| COVERAGE DESCRIPTION | COVERAGE LIMIT | PREMIUMS | | |
|---|---|---|---|---|
| COVERAGE IS PROVIDED WHERE A COVERAGE LIMIT OR PREMIUM IS SHOWN FOR THE COVERAGE | | VEH 9 | VEH 10 | VEH 11 |
| LIABILITY | 500,000 | 1621.00 | 633.00 | 247.00 |
| UNINSURED/UNDERINSURED MOTORISTS | 500,000 | 106.00 | 106.00 | 106.00 |
| MEDICAL EXPENSES | 100,000 | 95.00 | | |
| COMPREHENSIVE - FULL GLASS | | 193.00 | 135.00 | 43.00 |
| COLLISION | | 1243.00 | 1184.00 | 248.00 |
| OPTIONAL COVERAGES PREMIUM | | 29.00 | 61.00 | 67.00 |
| VEHICLE PREMIUM | | 3287.00 | 2119.00 | 711.00 |

*Id.* at 120.

A section about "General Conditions" for the auto policy contained a severability clause, stating: "This insurance applies separately to each *insured person*. This rule will not increase *our coverage limit* for any one *occurrence*." *Id.* at 52 (emphasis in original).

The Illinois auto endorsement modified the general conditions with a provision titled "**OTHER INSURANCE**." *Id.* at 58 (emphasis in original). That section stated: "Any recovery for damages for *bodily injury* sustained by an *insured person* may equal but not exceed the higher of the applicable limit for any one vehicle under this insurance or any other insurance." *Id.* (emphasis in original). It also provided conditions for when "any insurance we provide for a vehicle *you* do not own shall be primary." *Id.* (emphasis in original).

The auto policy laid out a 60-day timeline for paying claimants, too. "*We'll* pay all the money *we* owe *you* within 60 days after *we* receive *your* sworn proof of loss. *Your* claim is considered settled when: *we* reach an agreement with *you* on the amount of the loss and a sworn

proof of loss is submitted; a final judgment is entered; or an appraisal award is filed with *us.*" *Id.* at 46 (emphasis in original).

### B. The Umbrella Policy

Bankers Standard also issued an umbrella policy to the Saslows that was effective at the time of the accident. *See* Def.'s Statement of Facts, at ¶ 42 (Dckt. No. 71); *see also* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 12 (Dckt. No. 80).

The umbrella policy, like the auto policy, contained declarations about the limits of coverage. *See* Def.'s Statement of Facts, at ¶ 44 (Dckt. No. 71). The policy provided $1 million in uninsured/underinsured coverage per occurrence. *See* Def.'s Statement of Additional Facts, at ¶ 28 (Dckt. No. 81); *see also* Umbrella Policy, at 321 (Dckt. No. 1-1).

The umbrella policy provided a definition of "required underlying insurance." *See* Umbrella Policy, at 224 (Dckt. No. 1-1). "*Required underlying insurance* means an *insured person's* liability insurance that is required to be maintained in force for the types of personal exposures and at the minimum limits shown in the Schedule of Required Underlying Insurance And Limits." *Id.* (emphasis in original).

That schedule referred to underlying "Personal Automobile Liability" and "Uninsured/Underinsured Motorists" coverage. *Id.* at 222. It referred to other kinds of underlying coverage, too. *Id.*

The umbrella policy included an endorsement about "**UNINSURED/UNDERINSURED COVERAGE**." *Id.* at 235 (emphasis in original). Under a subheading titled "**Uninsured/Underinsured Motorists Coverage,**" the umbrella policy provided that Bankers Standard will "cover *damages* for *bodily injury* and *property damage* an *insured person* is legally entitled to receive from the owner or operator of an uninsured or underinsured *auto* or

*recreational motor vehicle* if the *bodily injury* or *property damage* is caused by an *occurrence* during the *policy period*." *Id.* (emphasis in original).

The endorsement also provided that Bankers Standard "will pay in excess of *damages* covered by *required underlying insurance* plus the applicable limits of any other collectible insurance that covers the *insured person* for the *occurrence*." *Id.* (emphasis in original).

In a similar vein, the endorsement provided that Bankers Standard "will pay *damages* to the extent that the *damages* are covered under both *required underlying insurance* and this policy. . . . When this policy pays *damages* in excess of *required underlying insurance* exhausted by payment of claims, this policy will not provide broader coverage than is provided under *required underlying insurance*." *Id.* (emphasis in original).

The endorsement defined "insured person" to include the insured and residents of the insured's household who are family members or other people "under the age of 25 and in the care of" the insured or their family members. *Id.*

The endorsement also spoke to Bankers Standard's liability limits. It provided that the total liability for all damages for uninsured/underinsured coverage "will not be more than the Uninsured/Underinsured Coverage limit as shown in the Declarations. This limit is the most we will pay regardless of the number of *insured persons*, claims made, persons injured, locations insured, or vehicles . . . involved in an *occurrence*. We will not make a duplicate payment under this endorsement for any element of loss for which payment has been made by or on behalf of persons or organizations who may be legally responsible." *Id.* at 236 (emphasis in original).

## IV.    The Claims Made by Saslow & Spencer to Bankers Standard

After settling with Bredeson (again, the driver) and Berry Brothers Firewood, Ronald Saslow and Theresa Spencer made claims to Bankers Standard for medical expenses coverage

17

and uninsured/underinsured motorists coverage under the Saslows' two policies (*i.e.*, the auto policy and the umbrella policy). *See* Def.'s Statement of Facts, at ¶ 16 (Dckt. No. 71).

It took four months to get the payments.

Plaintiffs' counsel submitted $448,045.58 in medical bills for Ronald Saslow to Bankers Standard in April 2021. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 15 (Dckt. No. 80). Counsel also submitted $55,678.01 in medical bills for Spencer. *Id.* at ¶ 16.

Plaintiffs' counsel followed up with their demands for payment of the medical expenses a second time in late April. *Id.* at ¶ 17. After not receiving a response, they followed up again in May. *Id.* at ¶ 18.

Finally, Bankers Standard's counsel advised Plaintiffs that the company would issue medical payments. *Id.* at ¶ 19. A week later, Bankers Standard's counsel followed up. *Id.* at ¶ 20. Bankers Standard's counsel demanded that Plaintiffs' counsel acknowledge that various liens might exist. *Id.* Counsel also demanded a hold harmless letter or other proof that Plaintiffs would satisfy any liens. *Id.*

As requested, Plaintiffs' counsel sent Bankers Standard's counsel a hold harmless letter in June 2021. *Id.* at ¶ 21. Plaintiffs' counsel also demanded – for the fourth time – payment of the medical expenses for Saslow and Spencer. *Id.* Bankers Standard's counsel informed Plaintiffs that it had issued the medical payments check and placed it in the mail. *Id.* at ¶ 22.

Bankers Standard's financial logs include line items indicating that it attempted to pay $100,000 to Saslow, and $55,678.01 to Spencer, in early June 2021. *See* Def.'s Statement of Facts, at ¶ 57 (Dckt. No. 71). However, those payment were unsuccessful, so Bankers Standard stopped payment on the checks. *Id.* at ¶ 58.

After not receiving payment for medical expenses, Plaintiffs' counsel (for a fifth time) demanded payment of the medical expenses coverage in July 2021. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 24 (Dckt. No. 80). Plaintiffs' counsel requested payment by FedEx. *Id.*

Plaintiffs didn't receive payment, so they made a sixth demand in August 2021. *Id.* at ¶ 25. This time, Plaintiffs' counsel informed Bankers Standard that, if Plaintiffs' counsel did not receive the checks within a couple of business days, Plaintiffs would seek legal recourse. *Id.*

Bankers Standard's counsel responded that the company would issue the check and mail it directly to Plaintiffs' counsel's office. *Id.* at ¶ 26. But two weeks later, Plaintiffs had not received payment. *Id.* at ¶ 27.

So, Plaintiffs filed a declaratory judgment action in Illinois state court on August 17, 2021. *Id.* They sought damages under section 155 of the Illinois Insurance Code for Bankers Standard's "unreasonable and vexatious" delay in paying the coverage due. *Id.*

Bankers Standard's internal claims notes provide an explanation about the problem with the checks. *See* Def.'s Statement of Facts, at ¶ 59 (Dckt. No. 71). Apparently, back in June 2021, Bankers Standard adjuster David Updegraff mailed the checks to an old address of defense counsel, who had since moved office buildings. *Id.* at ¶¶ 59–62. Defense counsel had experienced "mail issues since their move." *Id.*

Updegraff (the adjuster) placed a "stop payment" order on the checks and reissued them on August 3 (*i.e.*, the day before Plaintiffs' counsel demanded to have the checks in their possession). *Id.* at ¶ 59. The $100,000 payment to Saslow was issued but was "not mailed overnight or with any tracking." *Id.* The payment of $55,678.01 for Spencer "was entered in the claim system but never issued." *Id.* "It [was] unknown where the $100k[] check . . . ended up" given that Plaintiffs' counsel hadn't received it. *Id.*

19

Basically, Updegraff's attempts to issue payments failed, once again. *Id.* at ¶ 63.

Finally, Bankers Standard successfully paid Saslow and Spencer on August 19, 2021. *Id.* at ¶¶ 65–66; *see also* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 28 (Dckt. No. 80). Plaintiffs' counsel received $100,000 for Saslow. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 28. And Plaintiffs' counsel received $55,678.01 for Spencer. *Id.* at ¶ 29.

Before Bankers Standard successfully issued the checks, it had received at least six written demands for payment, over a four-month period from April to August 2021. *Id.* at ¶ 38.

But that wasn't the end of things. In October 2021, Updegraff sent Plaintiffs' counsel a letter explaining Bankers Standard's position on whether it owed Saslow more money. *See* 10/13/21 Letter re Saslow (Dckt. No. 68-1). The letter addressed both the auto policy and the umbrella policy.

Updegraff's letter explained that Bankers Standard believed that the accident did not qualify for the auto policy's uninsured/underinsured motorists coverage. *Id.* at 2. Saslow had received $879,832.23 from EMC Insurance. *Id.* That amount exceeded the $500,000 limit for uninsured/underinsured motorists coverage. *Id.*

Bankers Standard agreed with Plaintiffs that Saslow qualified for medical expenses coverage under the auto policy. *Id.* However, it believed that a $100,000 limit applied on a per person basis – and it had already paid $100,000 to Saslow. *Id.* So, Bankers Standard believed that it didn't owe Saslow any additional money for medical expenses under the auto policy.

Turning to the umbrella policy, Bankers Standard "agree[d] to treat the underinsured motorists coverage in the Umbrella policy as potentially implicated as to Mr. Saslow." *Id.* It agreed to pay $1 million to Saslow "in full satisfaction of the Umbrella policy's Uninsured/Underinsured Coverage Limit Per Occurrence." *Id.*

20

Updegraff sent a second letter in October 2021 clarifying Bankers Standard's position on Spencer's claims. *See* 10/13/21 Letter re Spencer (Dckt. No. 68-2). The letter acknowledged that Spencer was entitled to recover up to $100,000 in medical expenses under the auto policy. *Id.* at 3. Spencer was entitled to coverage under the underinsured motorists coverage provision, too, "subject to the limit of liability, which limit is reduced by payments of medical expenses." *Id.* However, Spencer did not qualify as an "insured person" under the umbrella policy and could not recover under that policy. *Id.*

Ultimately, in October 2021, Bankers Standard paid $1 million to Ronald Saslow under the uninsured/underinsured motorists coverage in its umbrella policy. *See* Def.'s Statement of Facts, at ¶ 67 (Dckt. No. 71).

In May 2022, Bankers Standard paid $33,850 to Spencer for additional medical expenses. *Id.* at ¶ 68. In total, Bankers Standard has paid $89,528.01 to Spencer for medical expenses. *Id.* at ¶ 69.

## V.    This Lawsuit

In 2022, Ronald Saslow, Ellen Saslow, and Theresa Spencer filed an amended complaint. The amended complaint includes 14 counts and seeks a declaratory judgment. Bankers Standard removed the case to federal court.[3] *See* Notice of Removal (Dckt. No. 1).

Count I seeks damages under section 155 of the Illinois Insurance Code. *See* First Am. Cplt., at 3–6 (Dckt. No. 1-1).

Counts II, III, and IV relate to the auto policy. Count II seeks a declaration about medical expenses coverage per covered vehicle. *Id.* at 6–7. Count III seeks a declaration about

---

[3] The removal wasn't late, because Plaintiffs didn't serve Bankers Standard with the original complaint in 2021.

uninsured/underinsured coverage per covered vehicle. *Id.* at 7–9. Count IV seeks a declaration about uninsured/underinsured coverage as applied to each tortfeasor. *Id.* at 9–10.

Counts V, VI, and VII relate to the umbrella policy. Count V seeks a declaration about uninsured/underinsured coverage per covered vehicle. *Id.* at 10–11. Count VI seeks a declaration about uninsured/underinsured coverage as applied to each tortfeasor. *Id.* at 11. Count VII seeks a declaration about uninsured/underinsured coverage to match liability limits. *Id.* at 11–12.

Finally, the next seven counts are about the loss of consortium. Counts VIII to XIV seek recovery for the loss of consortium under both the auto policy and the umbrella policy. *Id.* at 12–13. In essence, Ellen Saslow contends that, as the wife of Ronald Saslow, she is entitled to recover for loss of consortium, separate and apart from any recovery by her husband. *Id.*

By request of the parties, the Court bifurcated discovery. *See* 7/24/23 Order (Dckt. No. 43). Phase 1 of discovery revolved around "any factual issues that might inform the 'principal legal issues,' including issues about policy limits, setoffs, and whether Defendants unreasonably and vexatiously delayed payment." *Id.* Phase 2 of discovery, if necessary, would involve damages. *Id.*

Phase 1 of discovery closed. *See* 2/13/24 Order (Dckt. No. 64). At that point, the parties filed cross motions for summary judgment. *See* Def.'s Mtn. for Summ. J. (Dckt. No. 69); Pls.' Mtn. for Summ. J. (Dckt. No. 72).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the non-moving party, giving the non-moving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

When, as here, parties file cross motions for summary judgment, the Court construes all facts and draws all reasonable inferences in favor of the party against whom the motion was filed. *See Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir. 2017). The Court treats the motions "separately in determining whether judgment should be entered in accordance with Rule 56." *Marcatante v. City of Chicago*, 657 F.3d 433, 439 (7th Cir. 2011); *see also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019) ("Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim.").

## Analysis

Plaintiffs bring a cluster of claims under Illinois law.[4]  The key question that underlies many of the claims is whether Plaintiffs can combine (or "stack") coverage limits corresponding to each insured vehicle.

The case involves an insurance concept known as "stacking."  By way of forewarning, "[s]tacking of insurance coverages is a very complex and difficult issue that has produced a large amount of discussion, controversy, litigation, and legislation."  *See* 12 Couch on Insurance § 169:1 (3d ed. 2024).

If that warning isn't foreboding enough, the case law "has produced its share of analytical inconsistency."  *Id.*  And not to pile on, but "there has been considerable, often vehement, dispute over an insured's right to stack coverages protecting against injury by uninsured motorists, underinsured motorists, or both types of coverages."  *See* 12 Couch on Insurance § 169:18 (3d ed. 2024).

The dispute largely swirls around the issue of stacking, so the Court will start there.  The Court will address the auto policy first, and then the umbrella policy.

Next, the Court will turn to Plaintiffs' arguments about whether Bredeson (the driver of the truck) was uninsured.  Then, the Court will assess whether Ellen Saslow is entitled to recover for loss of consortium.  Finally, the Court will address Plaintiffs' claim under section 155 of the Illinois Insurance Code for vexatious and unreasonable delay in payment.

---

[4]  Because this Court sits in diversity, the Court applies the choice-of-law rules of Illinois, the forum state. *See NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 300 (7th Cir. 2018) (citation omitted). Illinois courts apply Illinois law "unless an actual conflict with another state's law is shown."  *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020).  The parties agree that Illinois law governs this dispute.  *See* First Am. Cplt. (Dckt. No. 1-1) (citing Illinois law); Def.'s Mem. in Supp. of Def.'s Mtn. for Summ. J., at 4–5 (Dckt. No. 70) ("As the policies indicate on their face that they were issued to the Saslows in Illinois and include Illinois-specific endorsements, BSIC agrees that Illinois law controls . . . .").  So, the parties haven't pointed to a conflict.  The Court will thus apply Illinois law.

I.      **Stacking of Coverage (Counts II, III, & V)**

In large part, the outcome of the dispute turns on whether the auto and umbrella policies allow for stacking.

"Stacking" refers to combining coverage limits for insurance. That is, stacking involves aggregating coverage for a loss when a policy contains more than one coverage, or when an insured has more than one policy. Basically, the coverages or policies "stack" on top of one another, and an insured can recover up to the limit on multiple coverages or policies. At bottom, stacking increases the amount an insured can recover.

"The concept of 'stacking' coverages . . . arises when the same claimant and the same loss are covered under multiple policies, or under multiple coverages contained in a single policy, and the amount available under one policy is inadequate to satisfy the damages alleged or awarded. In essence, stacking describes the phenomenon of insureds or claimants against them adding all available policies together to create a greater pool in order to satisfy their actual loss." *See* 12 Couch on Insurance § 169:4 (3d ed. 2024).

Consider the following example. Imagine if someone owned a Ferrari, a Tesla, and a 1969 Volkswagen Beetle. Imagine if he had a policy with $100,000 in coverage per person per car for medical expenses for personal injuries. And imagine if the driver gets in an accident, and suffers $350,000 in medical bills. If there is no stacking, then the insurance company must pay only $100,000. But if there is stacking, then each of the $100,000 amounts (per car) gets added together, for a total payment of $300,000.

The difference between buying a policy with stacking and buying a policy without stacking is the difference between buying an eight-foot extension ladder and buying an ordinary eight-foot ladder.

If there is stacking, individual amounts of coverage can be added together to create an aggregate amount of coverage. That is, the insured could take advantage of the two-fold coverage (or more, depending on the policy), and can apply the aggregate coverage to one loss. An eight-foot ladder could become a sixteen-foot ladder. One thing could do double duty. But if there is no stacking, then the coverage is what the coverage is. It's an eight-foot ladder.

Sometimes stacking involves adding together multiple coverages within a single policy. *See* 12 Couch on Insurance § 169:36 (3d ed. 2024). A good example is an insurance policy that covers more than one car. The industry refers to that type of stacking as intra-policy stacking (or vertical stacking).

Sometimes stacking involving adding together coverages across more than one policy. *See* 12 Couch on Insurance § 169:54 (3d ed. 2024). The industry refers to that type of stacking as inter-policy stacking (or horizontal stacking).

Some policies prohibit stacking, and some policies permit it. Illinois law enforces antistacking clauses. "As a general rule, antistacking clauses in insurance policies do not violate public policy." *See Kuhn v. Owners Ins. Co.*, 2024 WL 2339351, at ¶ 16 (Ill. 2024). So, if a policy contains an unambiguous antistacking provision, it "will be given effect." *Hess v. Est. of Klamm*, 161 N.E.3d 183, 187 (Ill. 2020); *see also Grzeszczak v. Illinois Farmers Ins. Co.*, 659 N.E.2d 952, 959–60 (Ill. 1995).

"Whether an insurance policy prohibits or permits stacking is a legal issue." *Nationwide Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir. 2015). An insurance policy is a contract, so "the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies." *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d

561, 564 (Ill. 2005). The "primary objective" in interpreting an insurance policy "is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Id.*

"Policy language is ambiguous if it is susceptible to more than one reasonable interpretation." *Hess*, 161 N.E.3d at 188. "If the policy language is unambiguous, the policy will be applied as written, unless it contravenes public policy. . . . Whether an ambiguity exists turns on whether the policy language is subject to more than one reasonable interpretation." *Hobbs*, 823 N.E.2d at 564 (citation omitted).

"Reasonableness is the key." *Hess*, 161 N.E.3d at 188. A policy is not ambiguous simply because the parties disagree about what it means. *See Central Illinois Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (Ill. 2004). Courts find an ambiguity "if the language of the contract is "obscure in meaning through indefiniteness of expression." *Id.* at 213.

The question is not "whether creative possibilities can be suggested." *Bruder v. Country Mut. Ins. Co.*, 620 N.E.2d 355, 362 (1993). Courts do not "strain to find an ambiguity where none exists." *Hobbs*, 823 N.E.2d at 564. But if a policy is ambiguous, courts read the policy in favor of the insured. *Kuhn*, 2024 WL 2339351, at ¶ 16.

A reasonable interpretation requires reading the policy as a whole. *See Cherry v. Elephant Ins. Co., Inc.*, 94 N.E.3d 1265, 1270 (Ill. App. Ct. 2018).

With that framework in mind, the Court will dig into both policies to see whether they permit stacking. The Court will look at the auto policy, and then the umbrella policy.

### A. The Auto Policy (Counts II & III)

#### 1. Antistacking Language

The starting point is figuring out whether the auto policy contains antistacking language. The Court concludes that it does.

27

The policy explains "how much *we'll* pay for any loss *we* cover." *See* Auto Policy, at 45 (Dckt. No. 1-1) (emphasis in original). "*Your coverage limit* is the most *we'll* pay for an *occurrence* or loss. Each type of coverage has its own limit, shown on the Declarations Page." *Id.* (emphasis in original).

The next page gets more specific about "how much *we'll* pay for an *occurrence* covered by *your* liability, *medical expenses* or uninsured motorists coverage." *Id.* at 46 (emphasis in original). Two paragraphs explain the coverage limits for medical expenses, and for uninsured/underinsured motorists.

"For *medical expenses* covered by *your* Auto Policy, *we'll* pay up to *your* liability *coverage limit*. That is the most *we'll* pay for each person injured in any one *vehicle accident*, no matter how many people or vehicles were involved." *Id.* (emphasis in original).

"For damages covered by *your* uninsured/underinsured motorists coverage, *we'll* pay up to *your coverage limit* for that coverage. That is the most *we'll* pay for each *occurrence*, no matter how many people or vehicles were involved." *Id.* (emphasis in original).

That language goes a long way to prohibit stacking. The text sets a hard ceiling on the amount of coverage. Bankers Standard would pay "up to" the coverage limit for medical expenses, and would pay "up to" the coverage limit for uninsured/underinsured motorists. *Id.* The phrase "up to" suggests a hard cap, not a starting point.

The phrase "the most" does work here, too. The coverage limits are "the most" that Bankers Standard will pay. *Id.* That phrase sends an unmistakable message. The coverage limit is the maximum amount that the insured can recover. It would be strange to read "the most" as anything other than a ceiling.

Plaintiffs highlight the fact that the coverage limit refers to the declarations pages. *See* Pls.' Reply in Supp. of Pls.' Mtn. for Summ. J., at 9 (Dckt. No. 89). "Each type of coverage has its own limit, shown on the Declarations Page." *See* Auto Policy, at 45 (Dckt. No. 1-1) (emphasis in original).

That language doesn't get Plaintiffs very far. It simply means that the declarations pages include the specific dollar amount of coverage for each type of claim. That is, the declarations pages are where an insured would look to see the number itself. It doesn't address the permissibility of stacking.

The Seventh Circuit addressed similar language in *Grinnell Select Insurance Co. v. Baker*, 362 F.3d 1005 (7th Cir. 2004). There, the policy included language about the "maximum limit of liability." *Id.* at 1006. "The limit of liability shown in the Declarations for each person for Bodily Injury Liability is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of 'bodily injury' sustained by any one person in any one auto accident. Subject to this limit for each person, the limit of liability shown in the Declarations for each accident for Bodily Injury Liability is our maximum limit of liability for all damages for 'bodily injury' resulting from one auto accident." *Id.*

To cement the point, another provision reaffirmed that the limit of liability was "the most we will pay." *Id.* "This is the most we will pay regardless of the number of:

       1. 'Insureds';

       2. Claims made;

       3. Vehicles or premiums shown in the Declarations; or

       4. Vehicles involved in the auto accident."

*Id.*

The Seventh Circuit made quick work of that language, which it characterized as "anti-stacking clauses." *Id.* Judge Easterbrook didn't beat around the bush, or pull any punches. "It is hard to imagine clearer language." *Id.* at 1006.

The Illinois Supreme Court confronted similar language and landed in the same place in *Hobbs v. Hartford Insurance Co. of the Midwest*, 823 N.E.2d 561 (Ill. 2005). The policy in question contained the following language: "The limit of liability shown in the Declarations for each person for Underinsured Motorists Coverage is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of bodily injury sustained by any one person in any one accident. This is the most we will pay regardless of the number of:

      1. Insureds;

      2. Claims made;

      3. Vehicles or premiums shown in the Declarations; or

      4. Vehicles involved in the accident."

*Id.* at 564–65. The Illinois Supreme Court characterized that language as an "antistacking provision." *Id.* at 564.

The same conclusion applies here. The policies in *Grinnell* and in *Hobbs* contained language establishing "the most" that the insurers would pay. The Seventh Circuit and the Illinois Supreme Court characterized that language as an antistacking provision Here, the policy in question made the same point, by including language saying that the coverage limit was "the most *we'll* pay." *See* Auto Policy, at 45 (Dckt. No. 1-1) (emphasis in original). That's antistacking language.

Basically, in *Grinnell* and in *Hobbs*, the policies said that the insurer would pay the coverage limit, and no more, regardless of the number of (1) insureds; (2) claims made; (3) vehicles or premiums shown in the declarations; or (4) vehicles in the car crash. The Bankers Standard policy included similar language. The policy said that the insurer would pay the coverage limit, and no more, regardless of the number (1) people involved; or (2) vehicles involved.

True, the language in the policy in question is not identical to the language in the policies in *Grinnell* and in *Hobbs*. Each of those policies said that the insurer would pay up to the limit of liability, regardless of the "number of . . . [v]ehicles or premiums shown in the Declarations." *Grinnell*, 362 F.3d at 1006; *Hobbs*, 823 N.E.2d at 564.

That exact language did not appear in the Bankers Standard policy. Instead, the policy said: "That is the most *we'll* pay for each *occurrence*, no matter how many people or vehicles were involved." *See* Auto Policy, at 45 (Dckt. No. 1-1) (emphasis in original).

The language of the policies may not be identical, but the thrust is the same – the insurer would pay up to the limit of liability, and no more. In effect, the policy said that the insurer would pay $X, and no more, regardless of A or B. It didn't need to say that the insurer would pay $X, and no more, regardless of A, B, or C.

*Grinnell* and *Hobbs* did not hang their hats on the phrase "vehicles or premiums shown in the Declarations," either. Each time, the appellate courts read the provisions as a whole, and interpreted them as antistacking clauses that set a maximum limit on the amount of coverage. No particular phrase in those antistacking provisions received disproportionate attention. There is no reason to think that the phrase "number of . . . [v]ehicles or premiums shown in the

Declarations" was essential to the outcomes. *See Grinnell*, 362 F.3d at 1006; *Hobbs*, 823 N.E.2d at 564.

Read naturally, a phrase that begins "no matter" is intended to emphasize the expansiveness of the preceding phrase. "Don't go in the river, no matter how hot it is" doesn't mean that you can go in the river if it *isn't* hot. "I won't root for the Packers, no matter if the tickets are free" doesn't mean that you'll root for the Packers if they throw in free beer. "No matter" means no matter *what*.

It would be strange to read the phrase "no matter how many people or vehicles were involved" to detract from the expansiveness of the preceding phrase. The "no matter" phrase is a clarification, not a restriction, of the broader principle. The phrase underscores the breadth of the limitation of liability. Reading that phrase to *narrow* the limitation of liability would turn the provision on its head.

Imagine if the sentence stopped after "occurrence." No one would be confused by the following sentence: "[t]hat is the most *we'll* pay for each *occurrence*." It sets a hard cap. Adding the phrase that begins with "no matter" does not water it down. The phrase "[t]hat is the most *we'll* pay for each *occurrence*" is not a broader limitation of liability than "[t]hat is the most *we'll* pay for each *occurrence*, no matter how many people or vehicles were involved."

"Not-X, even if Y" does not change a simple fact: "Not-X."

Another provision of the Bankers Standard policy cements the point. The policy includes an Illinois auto endorsement with an "other insurance" clause. *See* Auto Policy, at 58 (Dckt. No. 1-1). That clause reads: "Any recovery for damages for *bodily injury* sustained by an

32

*insured person* may equal but not exceed the higher of the applicable limit for any one vehicle under this insurance or any other insurance."[5]  *Id.* (emphasis in original).

On its face, the "other insurance" clause prohibits stacking.  It limits recovery for damages to "the higher of the applicable limit for any one vehicle under this insurance."  *Id.* The phrase "one vehicle" means one vehicle.  The "other insurance" clause places a cap on any recovery at the coverage limit for a *single* car.

That provision means what it says.  Coverage is limited to a set amount per car.  An insured cannot recover medical expenses for Car #1, Car #2, and Car #3 based on an accident involving only Car #1.  That's three cars, and three cars is more than "one vehicle."

Courts have concluded that similar "other insurance" clauses unambiguously prohibited stacking.  For example, the Seventh Circuit addressed an "other insurance" clause in *Nationwide Agribusiness Insurance Co. v. Dugan*, 810 F.3d 446 (7th Cir. 2015).  The insured attempted to "stack the underinsured motorist coverage limits provided for each of their four covered vehicles."  *Id.* at 453.

The Seventh Circuit held that an "other insurance" provision stood in the way.  The language provided as follows:  "[a]ny recovery for damages under all such policies or provisions of coverage may equal, but not exceed, the highest applicable limit for any one vehicle under any insurance providing coverage on either a primary or excess basis."  *Id.* (cleaned up).

The Seventh Circuit concluded that the "other insurance" provision "admits a clear anti-stacking function."  *Id.* at 453.  "The 'Other Insurance' provision . . . unambiguously states that in such a situation – where 'there is other applicable underinsured motorists coverage available under one or more . . . provisions of coverage' – the insured's recovery 'under all such

---

[5]  This provision applies to medical expenses, not uninsured/underinsured motorists.

. . . provisions of coverage may equal[,] but not exceed[,] the highest applicable limit for any one vehicle.'" *Id.* at 453–54 (brackets in original). The court concluded: "Since the highest applicable limit for any one vehicle in this case is $100,000, the 'Other Insurance' provision limits the Dugans [sic] recovery to that amount." *Id.*

Illinois appellate courts have reached the same conclusion. In *Willison v. Economy Fire & Casualty Co.*, an Illinois appellate court considered an "other insurance" clause. The clause provided: "If there is other applicable similar insurance available under more than one policy or provision of coverage . . . [a]ny recovery for damages for bodily injury sustained by an insured may equal but not exceed the higher of the applicable limit for any one vehicle under this insurance or any other insurance." *See Willison v. Econ. Fire & Cas. Co.*, 690 N.E.2d 1073, 1074 (Ill. App. Ct. 1998). The court concluded that the policy unambiguously prohibited stacking. *Id.* at 1077; *see also McElmeel v. Safeco Ins. Co. of Am.*, 851 N.E.2d 99, 103–04 (Ill. App. Ct. 2006) (holding that an "other insurance" clause "identical" to the one in *Willison* was unambiguous and barred stacking).

The statutory backdrop here cements the conclusion that the "other insurance" clause is an antistacking provision. The "other insurance" language in the policy resembles language in the Illinois Insurance Code that permits antistacking provisions.

The Illinois Insurance Code expressly permits antistacking clauses in the context of uninsured/underinsured motorist coverage.[6] *See* 215 ILCS 5/143a-2(5). The language used in the "other insurance" clause of the policy at hand resembles (but does not quite mirror) the language used in the relevant portion of the Illinois Insurance Code. *See id.* ("Nothing herein

---

[6] Illinois law does not explicitly address anti-stacking clauses in the context of medical expenses coverage. Even so, there is no reason to think that any state statute prohibits them. And in any event, the citation to the Illinois Insurance Code is simply icing on the cake when it comes to coverage for uninsured/underinsured motorists. It is not the cake.

shall prohibit an insurer from setting forth policy terms and conditions which provide that if the insured has coverage available under this Section under more than one policy or provision of coverage, any recovery or benefits may be equal to, but may not exceed, the higher of the applicable limits of the respective coverage, and the limits of liability under this Section shall not be increased because of multiple motor vehicles covered under the same policy of insurance."). The similarity supports a conclusion that the "other insurance" clause was an unambiguous antistacking provision. *Cf. Dugan*, 810 F.3d at 453 (opining that the "other insurance" provision "admit[ted] a clear anti-stacking function" by "mirroring the language" used in the Illinois Insurance Code).

Once again, Plaintiffs point to the declarations. Plaintiffs believe that the "other insurance" clause does not preclude stacking "in light of the fact that the Declarations Page lists the limits on multiple occasions." *See* Pls.' Resp. to Defs.' Mtn. for Summ. J., at 13 (Dckt. No. 82).

The Court agrees that the declarations must be read in conjunction with the antistacking language. The Court can't simply consider antistacking language in isolation. The Court must review the policy as a whole, including the declarations. *See Hobbs*, 823 N.E.2d at 564–67 (reviewing an antistacking clause together with a declarations page); *Hess*, 161 N.E.3d at 189–90 (same); *Dugan*, 810 F.3d at 453; *id.* at 451 (reading the antistacking provision alongside the declarations page); *see also McElmeel*, 851 N.E.2d at 103 (same).

So, the Court will turn to a review of the declarations page.

### 2.	The Declarations

The antistacking provisions closed the door on the possibility of stacking coverage. The declarations pages do not open the door to an expansion of coverage.

35

As a reminder, the declarations span two pages. The first page addresses two of the cars, and the second page addresses the other three cars.

Plaintiffs believe that the declarations pages allow stacking. As they read it, "each of the vehicles is covered with $500,000 in [underinsured motorists] coverage and $100,000 in Medical Payments Coverage." *See* Pls.' Mem. in Support of Pls.' Mtn. for Summ. J., at 7 (Dckt. No. 72-1).

It is true that, in the declarations at hand, the coverage limits appeared on two separate pages. *See* Auto Policy, at 118–24 (Dckt. No. 1-1). Specifically, the coverage limits for medical expenses ($100,000) appeared twice, and the coverage limits for uninsured/underinsured motorists coverage ($500,000) appeared twice. *Id.* at 119–20.

The first page discussed two covered vehicles (the 2016 Dodge Challenger and the 2018 Acura RDX). *Id.* at 119. The second page discussed three other covered vehicles (the 2019 Acura RDX, the 2019 Tesla Model X, and the 2008 Tesla Roadster). *Id.* at 120. The coverage limits appeared once on the declarations page listing the 2016 Dodge Challenger and 2018 Acura RDX. *Id.* at 119. The coverage limits also appeared once on the other declarations page listing the 2019 Acura RDX and the two Teslas. *Id.* at 120.

In other words, Plaintiffs believe that they can stack the coverage, based on the fact the policy covers five vehicles. According to them, each vehicle comes with $100,000 in coverage for medical expenses, and $500,000 in coverage for uninsured/underinsured motorists. Adding them together, Plaintiffs believe that the policy provides $500,000 in coverage for medical expenses (5 cars x $100,000 per car = $500,000) and $2.5 million in coverage for uninsured/underinsured motorists (5 cars x $500,000 per car = $2.5 million).

36

Plaintiffs' argument stems from the Illinois Supreme Court's decision in *Bruder v. Country Mutual Insurance Co.*, 620 N.E.2d 355 (Ill. 1993).  In what is now known as the "*Bruder* dicta," the Illinois Supreme Court suggested that "[i]t would not be difficult to find an ambiguity" if a policy listed individual liability limits for each covered vehicle.  *Id.* at 355.  The Supreme Court reasoned that, in such a situation, "[t]here would be little to suggest" that the parties intended a single coverage limit to apply to both vehicles.  *Id.*  Instead, "[i]t would be more reasonable to assume that the parties intended" for each premium to correspond to a separate coverage limit.  *Id.*

The dicta in *Bruder* has not aged well.  Illinois courts have chipped away at the dicta in *Bruder*, eroding its ability to carry much weight.  In *Hobbs*, the Illinois Supreme Court clarified that *Bruder* "should not be construed establishing a *per se* rule that an insurance policy will be deemed ambiguous as to the limits of liability any time the limits are noted more than once on the declarations."  *Hobbs*, 823 N.E.2d at 569 n.1.  Instead, "case-by-case review" is typically required.  *Id.*

In *Hess v. Estate of Klamm*, 161 N.E.3d 183 (Ill. 2020), the Illinois Supreme Court explained its reasoning in *Bruder* and *Hobbs*.  The Supreme Court opined that "the deciding factor in both decisions was whether the liability limits were listed separately for each of the covered vehicles, not whether they were listed 'twice.'"  *Id.* at 191.

The Illinois Supreme Court reiterated the limits of the *Bruder* dicta once again in *Kuhn v. Owners Insurance Co.*, 2024 WL 2339351 (Ill. 2024).  "[T]here is no bright-line rule that an insurance policy is ambiguous as to the limits of liability any time the limits are listed more than once on the declarations.  Instead we must consider each case individually, construing the applicable policy as a whole."  *Id.* at ¶ 39.

Time and again, the Supreme Court has pumped the brakes on reading too much into the number of times that a declarations page says the coverage limit. An insurance policy is not ambiguous simply because the declarations page states the coverage limit more than once. *See Kuhn*, 2024 WL 2339351, at ¶ 34; *Hess*, 161 N.E.3d at 189–91; *Hobbs*, 823 N.E.2d at 569 n.1.

Bankers Standard also provides a reason for the multiple pages. There wasn't enough room for five vehicles to fit on one declarations page. *See* Def.'s Reply in Supp. of Def.'s Mtn. for Summ. J., at 10 (Dckt. No. 88). Only four vehicles could fit on one page, so Bankers Standard had to split them up. *Id.*

Plaintiffs scoff at Bankers Standard's explanation. Plaintiffs argue that, if Bankers Standard merely split the vehicles up due to spacing issues, it "would have listed the first four vehicles on the first page with the fifth and final vehicle being listed on the second page." *See* Pls.' Resp. to Defs.' Mtn. for Summ. J., at 10 (Dckt. No. 82). Because Bankers Standard put three cars on the first page, and two on the second page, Plaintiffs contend that "one reasonable interpretation would be that the limit that is listed multiple times applies separately per vehicle insured, and premium paid, and stacking is allowed." *Id.*

That's much ado about a page break. Here, the declarations span two pages, but the coverage limits are not listed separately for each of the vehicles. The same limits appear twice – but each time, the limits appear on a page covering more than one vehicle. That is, the limits aren't repeated once per *car*; they're repeated once per *page*.

That format cuts against an inference that the policy includes stacking. *Cf. Hess*, 161 N.E.3d at 190–91 (rejecting plaintiffs' argument that stating liability limits twice "create[d] an ambiguity" where the declarations were listed on a second page only because "[t]here was simply not enough space on the first page" to fit all covered vehicles); *W. Bend Mut. Ins. Co. v.*

*Vaughan's Fetch, Inc.*, 2022 WL 1206597, at ¶ 26, *as modified on denial of reh'g* (Ill. App. Ct. 2022), *appeal denied*, 197 N.E.3d 1066 (Ill. 2022) (concluding that stacking was inappropriate where the declarations were repeated multiple times when the declarations were "identical and contain[ed] the same limit of liability").

      Plaintiffs cite several cases in support of their argument about stacking. *See* Pls.' Mem. in Support of Pls.' Mtn. for Summ. J., at 9–11 (Dckt. No. 72-1). But they involved situations different than the one at hand. Those cases involved policies that listed separate coverage limits for *each* covered vehicle. *See Johnson v. Davis*, 609, 883 N.E.2d 521, 529 (Ill. App. Ct. 2007) (concluding that a policy was ambiguous where "the limits of underinsured-motorists coverage are listed four separate times, once for each vehicle covered"); *Cherry v. Elephant Ins. Co., Inc.*, 94 N.E.3d 1265, 1271 (Ill. App. Ct. 2018) (same); *Yates v. Farmers Auto. Ins. Ass'n*, 724 N.E.2d 1042, 1045 (Ill. App. Ct. 2000) (similar); *Allen v. Transamerica Ins. Co.*, 128 F.3d 462, 467 (7th Cir. 1997) (reading the *Bruder* dicta to permit stacking where the liability limit was repeated alongside each covered vehicle); *Pekin Ins. Co. v. Est. of Goben*, 707 N.E.2d 1259, 1265 (Ill. App. Ct. 1999) (similar); *Bowers v. Gen. Cas. Ins. Co.*, 20 N.E.3d 843, 847 (Ill. App. Ct. 2014) ("The declarations page shows three UIM coverages of $250,000 and a UIM premium for each of the three vehicles. The language contained in the declarations page is inconsistent with the endorsement's antistacking provision and creates an ambiguity."); *Barlow v. State Farm Mut. Auto. Ins. Co.*, 127 N.E.3d 754, 759 (Ill. App. Ct. 2018) (concluding that the declarations page created an ambiguity where 16 vehicles were listed besides a "W," and the policy contained a key defining a "W" as "underinsured motorist coverage with limits of $250,000 per person and $500,000 per accident").

The fact that the $100,000 limit appears twice doesn't mean very much when the declarations include two pages. It is only natural that the coverage limit would appear on each page.

If anything, the reading offered by Plaintiffs stretches the boundaries of reasonableness. The policy covered five vehicles, and stated the coverage limit twice, meaning once on each page. Why would a policy list the liability limits *twice* if the intent was for the liability limits to apply *five* times? No reasonable person would interpret the policy that way.

At bottom, the Court "will not strain to find ambiguity" in the policy. *See Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 491 (Ill. 2001). The declarations pages do not weigh in favor of stacking, especially after viewing the policy as a whole.

### 3.     The Premium Rule

In their final pro-stacking salvo, Plaintiffs argue that the so-called "premium rule" applies. *See* Pls.' Mem. in Support of Pls.' Mtn. for Summ. J., at 4 (Dckt. No. 72-1). The bottom line is that the premium rule doesn't apply in Illinois unless the contract is ambiguous, and the contract is not ambiguous here.

"The premium rule in essence assumes that the parties did not intend that the insured would pay multiple premiums for identical coverage." *Am. Fam. Mut. Ins. Co. v. Martin*, 728 N.E.2d 115, 118 (Ill. App. Ct. 2000).

The basic idea is that "it is unfair to permit an insurer to collect premiums, be it for coverage afforded under separate policies or for separate vehicles under one policy, and thereafter apply a provision limiting or absolving liability." *Bruder*, 620 N.E.2d at 358.

To illustrate how the premium rule works, imagine that Old MacDonald paid a $70 premium for his horse, a $50 premium for his cow, and a $40 premium for his pig. Now,

imagine that the coverage limit was $50,000. Under the premium rule, if his horse broke its leg, Old MacDonald could stack coverages and recover up to $150,000.

Basically, Plaintiffs point out that the declarations pages list five vehicles. Three of the five vehicles include premiums for coverage for medical expenses. They appear for both vehicles on the first page (*i.e.*, the Dodge Challenger and the 2018 Acura RDX), and appear for one vehicle on the second page (*i.e.*, the 2019 Acura RDX, but not the two Teslas). The declarations give a coverage limit of $100,000 for medical expenses.

Based on that content, Plaintiffs believe that the premium rule applies. They believe that they can recover $100,000 for each of the five vehicles.

As an aside, that argument is wrong, even if the premium rule applied. Plaintiffs paid a premium for medical expenses coverage for only three of the five vehicles. So, even if the premium rule applied, Plaintiff could stack coverage for only three of the five vehicles. Plaintiffs didn't pay for medical expenses coverage for the other two vehicles (*i.e.*, the Teslas), so they couldn't be in the stack. The premium rule wouldn't allow an insured to stack five cars when they paid only three premiums for medical expenses.

Bankers Standard disagrees that the premium rule applies. *See* Def.'s Mem. in Opp. to Pls.' Mtn. for Summ. J., at 12 (Dckt. No. 79). It believes that the "other insurance" clause precludes application of the premium rule. *Id.* at 11.

"Not all jurisdictions apply some version of the 'premium rule.'" *See* 12 Couch on Insurance § 169:16 (3d ed. 2024). Some do, some don't.

The jurisdictions that do apply the premium rule have different versions – some are stronger than others. Some jurisdictions apply a strong form of the premium rule and hold that "the payment of multiple premiums entitles insureds to stack the coverages that they have

actually purchased regardless of whether the policy also contains clear and unambiguous provisions that would otherwise prohibit stacking." *Id.*

Illinois does not apply the strong version of the premium rule. "Illinois has consistently rejected claims that payment of multiple premiums alone entitles the insured to stack the coverages so purchased, following instead a rule much less favorable to insureds under which the payment of multiple premiums is only considered on the stacking issue if the policy's provisions prohibiting or limiting stacking are themselves ambiguous." *Id.*

The Illinois Supreme Court has "held that the payment of multiple premiums is of no consequence where the intent of the parties to the insurance contract was manifested in the clear and unambiguous language of an antistacking provision." *Grzeszczak*, 659 N.E.2d at 958.

Under Illinois law, the premium rule does not apply unless the policy is otherwise ambiguous. The policy itself is the starting point.

As discussed above, the policy at issue here is not ambiguous. Therefore, the premium rule does not come into play and tilt the scales in favor of stacking. *Cf. O'Hallaron v. Geico Cas. Co.*, 2022 WL 2072850, at *2–3 (S.D. Ill. 2022) (rejecting plaintiff's contention that separate premiums for each vehicle allowed for stacking where the policy contained "unambiguous and enforceable" antistacking language).

### 4.    The Uninsured/Underinsured Motorists Coverage

For the reasons explained above, the auto policy does not allow stacking. That conclusion applies to the coverage for medical expenses, and to the coverage for uninsured/underinsured motorists.

Along the way, the parties make four arguments about coverage for uninsured/underinsured motorists that deserve a brief mention.

42

First, Bankers Standard argues that the provision about uninsured/underinsured motorists does not apply at all. As a reminder, the policy covers a loss caused by an uninsured vehicle. An "uninsured vehicle" includes a vehicle that (1) is not covered by a policy for bodily injury; (2) is covered, but "the coverage limit is less than *your* limit for this coverage;" (3) is covered, but the insurer declines coverage or goes bankrupt; or (4) is driven by a hit-and-run driver. *See* Auto Policy, at 44 (Dckt. No. 1-1) (emphasis in original).

Bankers Standard argues that this case does not fall within any of those categories. And in particular, the insurer argues that this case does not involve another driver with a coverage limit that is "less than *your* limit for this coverage." *Id.*

As Bankers Standard points out, the other driver had insurance through his employer. EMC Insurance paid $879,832.23 to the Saslows. *See* Def.'s Statement of Facts, at ¶ 14 (Dckt. No. 71). Bankers Standard also points out that the policy that it issued to the Saslows includes a coverage limit of $500,000 for uninsured/underinsured motorists. *See* Auto Policy, at 119–20 (Dckt. No. 1-1).

As the insurer sees things, the amount of coverage from the other driver ($879,832.23) is not "less than" the coverage limit for uninsured/underinsured motorists ($500,000). So, in its view, the coverage for uninsured/underinsured motorists does not apply.

In response, Plaintiffs believe that the $500,000 limit does not apply, because the policy allows stacking. That is, when the coverage of $500,000 for each vehicle is stacked together, then the amount of coverage easily exceeds $879,832.23.

Each party basically assumes that it is right on the issue of stacking, and then makes an argument based on that assumption. That is, Bankers Standard assumes that stacking does not apply, and that the coverage limit is $500,000. On the flipside, Plaintiffs assume that stacking

does apply, and that the coverage limit is $2.5 million (or at the very least $1 million, because the $500,000 limit appears on two separate declarations pages).

This Court has concluded that the auto policy does not allow stacking. As a result, the coverage limit for uninsured/underinsured motorists was $500,000. And as a result, the Court concludes that the coverage for uninsured/underinsured motorists does not apply in the case at hand. That's because $500,000 is less than $879,832.23.

Second, Plaintiffs believe that, even if stacking is not permitted, the Berry Brothers Firewood truck is an underinsured vehicle under the auto policy. *See* Pls.' Resp. to Defs.' Mtn. for Summ. J., at 17–18 (Dckt. No. 82). Specifically, Plaintiffs argue that Ronald and Ellen Saslow were each entitled to $500,000 under the policy, for a total payment owed of $1 million. *Id.* at 17. And $1 million is not "less than" $879,832.23.

The Court rejects this argument for the reasons explained in its discussion of loss of consortium (below). In short, Ellen Saslow's loss of consortium claims are derivative of Ronald Saslow's injury claims. Ellen Saslow's recovery would come out of the same $500,000 bucket as Ronald Saslow's recovery.

Third, Plaintiffs contend that the "other insurance" clause turned the uninsured/underinsured motorist coverage into an "excess policy." *Id.* at 18. Specifically, Plaintiffs point to language in the "other insurance" provision stating that "for any occurrence that involves a vehicle not named on the Declarations Page, we'll pay liability, uninsured/underinsured motorists coverage or medical expenses only in excess of other coverage that applies." *Id.*

44

Bankers Standard disagrees that the auto policy constitutes excess coverage. *See* Def.'s Reply in Supp. of Def.'s Mtn. for Summ. J., at 6 (Dckt. No. 88). But it sees a more glaring problem.

Bankers Standard repeats the point that, even if the auto policy counts as excess coverage, the Saslows' settlement with EMC Insurance exceeded the auto policy's $500,000 limit. *Id.* That's true.

The "other insurance" clause contains clear antistacking language, which means that the underinsured motorist coverage limit was $500,000. That limit applies regardless of whether the "other insurance" clause turned the underinsured motorist coverage into an excess policy.

In short, the underinsured motorist coverage was capped at $500,000. But the Saslows got almost double that amount from EMC Insurance ($879,832.23). So, the Saslows cannot recover under the underinsured motorists coverage limit.

Fourth, Plaintiffs assert that Bankers Standard cannot reduce the $500,000 limit of underinsured motorist coverage, as applied to Spencer, by the amount of medical payments made to Ronald Saslow. *See* Pls.' Mem. in Support of Pls.' Mtn. for Summ. J., at 12 (Dckt. No. 72-1).

The policy provides that: "The limit of liability for underinsured motorists coverage shall be reduced by all sums [p]aid or payable because of the bodily injury under any automobile medical payments coverage. This includes all sums paid under the Medical Expenses section of this policy." *See* Auto Policy, at 56 (Dckt. No. 1-1) (cleaned up). It goes on to state that "[n]o one will be entitled to receive duplicate payments for the same elements of loss under this coverage and Liability and Medical Expenses and Uninsured/Underinsured Motorists Coverage of this policy." *Id.*

Plaintiffs believe that the clause is meant to prevent duplicate payments, but that "[a]ny medical payments made to Saslow certainly would not be duplicative to Spencer." *See* Pls.' Resp. to Defs.' Mtn. for Summ. J., at 19 (Dckt. No. 82). According to Plaintiffs, the language about uninsured/underinsured motorists coverage in the auto policy does not clarify whether one person's coverage could be capped because of medical expenses paid "to a totally different person." *Id.*

Bankers Standard sees things differently.[7] It focuses on the phrase "all sums." *See* Def.'s Reply in Supp. of Def.'s Mtn. for Summ. J., at 17 (Dckt. No. 88). In its view, "all sums" encompasses payments made to both Saslow and Spencer. *Id.*

Additionally, Bankers Standard points out that the policy imposes a per-occurrence limit, not a per-person limit. *Id.* It contends that, "[w]hen per occurrence limits apply to claims involving multiple claimants, amounts paid to one claimant necessarily affect the amount payable to the other claimant." *Id.* The Court agrees.

The policy differentiates between medical expenses and uninsured/underinsured motorists coverage. *See* Auto Policy, at 46 (Dckt. No. 1-1). For medical expenses, the medical expenses coverage limit "is the most [Bankers Standard will] pay for *each person* injured in any one vehicle accident . . . ." *Id.* (emphasis added). For uninsured/underinsured motorists coverage, Bankers Standard will "pay up to your coverage limit for that coverage. That is the most we'll pay for *each occurrence* . . . ." *Id.* (emphasis added).

---

[7] As an aside, each side accuses the other of making conclusory arguments. Plaintiffs contend that Bankers Standard "cites no case law or rationale" in support of its argument about reducing Spencer's uninsured/underinsured motorists coverage. *See* Pls.' Resp. to Defs.' Mtn. for Summ. J., at 19 (Dckt. No. 82). In turn, Bankers Standard calls Plaintiffs' argument "undeveloped and unsupported." *See* Def.'s Reply in Supp. of Def.'s Mtn. for Summ. J., at 17 (Dckt. No. 88). In reality, both sides have a point. Neither side cited case law in support of its argument. *Cf.* Pls.' Resp. to Defs.' Mtn. for Summ. J., at 19 (not citing case law); Def.'s Reply in Supp. of Def.'s Mtn. for Summ. J. (same). And both sides offered arguments spanning just a paragraph or two. So, neither side gave the Court much to work with.

In other words, the policy contemplated medical expenses coverage on a person-by-person basis. But it contemplated uninsured/underinsured motorists coverage on an occurrence-by-occurrence basis.

That is, the $500,000 uninsured/underinsured motorists coverage limit applied to the *occurrence*. The $500,000 cap applied across all payments to Saslow, Spencer, and whoever else. Given the per-occurrence nature of the policy, the reduction in payment for "bodily injury" applied to all medical expenses payments. *See* 12 Couch on Insurance § 171:14 (3d ed. 2024) ("The 'per occurrence' limit caps the carrier's liability to the set of claimants injured in one accident. The term 'bodily injury,' usually defined in the policy, generally refers to the individuals injured at the time of the accident. The term 'bodily injury' is also inclusive of derivative claims held by third parties.").

So, Spencer's recovery under the uninsured/underinsured motorists coverage provision could be reduced by payments made to Saslow.

For these reasons, the Court grants Bankers Standard's motion for summary judgment on Counts II and III. As a reminder, Count II seeks a declaration about medical expenses coverage per covered vehicle, and Count III seeks a declaration about uninsured/underinsured coverage per covered vehicle.

### B.    The Umbrella Policy (Count V)

The umbrella policy is a "follow form" policy to the auto policy – meaning that it follows the definitions, terms, and conditions of the auto policy (unless otherwise specified). *See* Umbrella Policy, at 235 (Dckt. No. 1-1). For that reason, Plaintiffs contend that the same

principles permit stacking under the auto and umbrella policies.[8]  *See* Pls.' Mem. in Support of Pls.' Mtn. for Summ. J., at 13 (Dckt. No. 72-1).

Bankers Standard points to antistacking language included in the umbrella policy.  *See* Def.'s Mem. in Opp. to Pls.' Mtn. for Summ. J., at 20 (Dckt. No. 79).  The language stated: "Our total liability for all *damages* . . . will not be more than the Uninsured/Underinsured Coverage limit as shown in the Declarations.  This limit is the most we will pay regardless of the number of *insured persons*, claims made, persons injured, locations insured, or vehicles . . . involved in an *occurrence*."  *See* Umbrella Policy, at 236 (Dckt. No. 1-1) (emphasis in original).

Unlike the declarations in the auto policy, the declarations in the umbrella policy do not list separate coverage limits for each vehicle.  The umbrella policy does list the insured vehicles one by one.  *Id.* at 213.  But it simply states once that the "Uninsured/Underinsured Coverage Limit Per Occurrence" is $1,000,000.  *Id.*

Plaintiffs acknowledge the inclusion of this antistacking language.  But they believe that it "clearly does not prevent the stacking based on premiums paid, vehicles insured and multiple listing of limits."  *See* Pls.' Mem. in Support of Pls.' Mtn. for Summ. J., at 13 (Dckt. No. 72-1).  As Plaintiffs see things, the $1 million limit should be stacked for each of the five vehicles, resulting in coverage of up to $5 million.  *Id.* at 14.  Not so.

The umbrella policy contains antistacking language.  That antistacking language refers to the declarations.  And the declarations show a $1 million limit across all policies.

---

[8]  The parties agree that Spencer is not an insured under the umbrella policy and therefore is not entitled to recover under it.  *See* Pls.' Resp. to Defs.' Mtn. for Summ. J., at 4 (Dckt. No. 82) (stating that Plaintiffs do not contest that "Spencer is not an insured person with respect to the Umbrella Policy").

There is no ambiguity. Stacking isn't allowed. The umbrella policy provides $1 million in underinsured motorist coverage, total (regardless of the number of insured cars). A pair of Illinois Supreme Court cases illustrates the point.

In *Hobbs*, the Illinois Supreme Court concluded that underinsured motorist coverage in the policy could not be stacked given that (1) the policy contained an antistacking clause that tied the limit of liability to the limit shown on the declarations page; (2) the declarations page listed the premiums for two vehicles separately, but listed the relevant limit of liability only once; and (3) the antistacking clause stated that the limit applied regardless of the number of covered vehicles. *See Hobbs*, 823 N.E.2d at 570–71.

Indeed, the Illinois Supreme Court reiterated this same principle in *Kuhn* earlier this year. *See Kuhn*, 2024 WL 2339351, at ¶ 39. The policy in *Kuhn* included antistacking language providing that coverage for one accident could not be expanded by adding limits for multiple insured vehicles together. *Id.*

The declarations pages in *Kuhn* listed distinct premium amounts for each vehicle. *Id.* at ¶ 38. The total sum of those premiums was listed next to "Combined Liability" of $1 million per accident. *Id.* As a result, the Illinois Supreme Court concluded that the limits could not be aggregated. *Id.* at ¶ 39.

*Hobbs* and *Kuhn* teach a simple lesson. When an insurance policy contains antistacking language and a declarations page lists the limit of liability once, stacking is not permitted.

That's true of the umbrella policy in this case. So, the umbrella policy does not permit stacking. Count V is dismissed. As a reminder, Count V seeks a declaration about uninsured/underinsured coverage per covered vehicle.

## II.     Bredeson & Berry Brothers Firewood as Separate Tortfeasors (Counts IV & VI)

In their motion for summary judgment, Plaintiffs contend that the uninsured/underinsured motorists coverage applies separately against Bredeson (*i.e.*, the truck driver) and Berry Brothers Firewood (*i.e.*, Bredeson's employer).[9]  *See* Pls.' Mem. in Support of Pls.' Mtn. for Summ. J., at 14 (Dckt. No. 72-1).  Plaintiffs argue that Bredeson was an "uninsured motorist" because he did not have his own insurance – meaning, separate from his employer's insurance – to cover him for the accident.  *Id.*

In Bankers Standard's view, Plaintiffs offer a novel theory by suggesting that Bredeson and Berry Brothers Firewood are separate for purposes of insurance coverage.  According to Bankers Standard, Illinois courts have never found that an insured can stack coverage based on two alleged tortfeasors in the same vehicle.  *See* Def.'s Reply in Supp. of Def.'s Mtn. for Summ. J., at 14–17 (Dckt. No. 88).

Bankers Standard doesn't just believe that Plaintiffs' theory is *legally* new.  It also believes that Plaintiffs' attempt to treat Bredeson and Berry Brothers Firewood separately is *factually* new.  *See id.* at 16–17.  Bankers Standard points out that Plaintiffs have previously lumped Bredeson and Berry Brothers Firewood together.  The Court agrees.

---

[9]  Plaintiffs' argument about separate tortfeasors in their summary judgment motion differs from their argument about separate tortfeasors in the operative complaint.  In the operative complaint, Plaintiffs asserted negligence by Bredeson and Leyva (Bredeson's passenger).  *See, e.g.*, First Am. Cplt., at ¶¶ 96, 110 (Dckt. No. 1-1).  In other words, the complaint stated that Bredeson and *Leyva* were the two tortfeasors from whom Plaintiffs wished to recover – not Bredeson and *Berry Brothers Firewood*.  Bankers Standard addressed the argument about Leyva's liability in its brief in support of its motion for summary judgment.  *See* Def.'s Mem. in Support of Def.'s Mtn. for Summ. J., at 14 (Dckt. No. 70).  Plaintiffs declined to respond to that point "[a]lthough not waving [sic] the issue."  *See* Pls.' Resp. to Defs.' Mtn. for Summ. J., at 4 (Dckt. No. 82).  A party waives any arguments in opposition to summary judgment not raised in a response brief, so the Court deems any possible arguments by Plaintiffs about Bredeson and Leyva sharing liability waived.  *See, e.g.*, *Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

Start with the operative complaint. It says that Bredeson was covered by Berry Brothers Firewood's EMC Insurance policy. It states: "On October 29, 2020, *Bredeson was covered under a policy of insurance issued by EMC INSURANCE COMPANIES providing $1 million in combined single limits.*" *See* First Am. Cplt., at ¶ 9 (Dckt. No. 1-1) (emphasis added). Elsewhere, the operative complaint states that "Ronald [Saslow] and Spencer accepted the amounts tendered from EMC INSURANCE COMPANIES and provided a full release of liability to EMC INSURANCE COMPANIES *and Mr. Bredeson*." *Id.* at ¶ 24 (emphasis added); *see also id.* at ¶¶ 22–23, 90, 96, 98, 107, 113, 115.

More importantly, Plaintiffs repeat the same line in their statement of facts. Plaintiffs' statement of facts states: "Plaintiffs' counsel requested permission from the Defendant to enter the proposed settlement and *fully release Bredeson and Berry Brothers*. Defendant granted permission to the Plaintiffs to accept the settlement and to provide the referenced release." *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 9 (Dckt. No. 80) (emphasis added).

Bankers Standard also noted the existence of coverage for Bredeson in its statement of facts, and in its statement of additional facts. *See* Def.'s Statement of Facts, at ¶ 11 (Dckt. No. 71) ("On October 29, 2020, Zacharia Bredeson was covered under a policy of insurance issued by EMC Insurance Companies providing $1 million in combined single limits."); Def.'s Statement of Additional Facts, at ¶ 5 (Dckt. No. 81) ("On October 29, 2020, Berry Brothers and its employee, Zacharia Bredeson, were covered under a policy of insurance issued by EMC Insurance Companies providing $1 million in combined single limits."). Plaintiffs did not respond, so under the Local Rules, it is deemed admitted.

As the Court reads the factual record, Bredeson was covered by the EMC Insurance policy. Plaintiffs alleged that fact in their complaint, and more importantly, Plaintiffs did not

deny that fact as part of the summary judgment record. So, the undisputed facts show that Bredeson was insured by EMC Insurance. Bredeson was not an uninsured, so Plaintiffs' theory that Bredeson was uninsured fails.[10]  Counts IV and VI are dismissed.

### III.  Loss of Consortium Benefits (Counts VIII to XIV)

The last seven claims of the complaint (Counts VIII to XIV) involve whether Ellen Saslow is entitled to loss of consortium benefits (separate from Ronald Saslow's recovery). *See* First Am. Cplt., at 12–13 (Dckt. No. 1-1).  In essence, Plaintiffs claim that Ronald Saslow can recover up to the full limits under the auto and umbrella policies, and so can Ellen Saslow.  *Id.*

While the parties' briefs span dozens of pages, the loss of consortium claims get only a few pages, tops.  Loss of consortium does not take center stage, and recedes into the background. In fact, neither side analyzes the loss of consortium claims in its opening brief.

As far as the Court can tell, the first discussion of Ellen Saslow's loss of consortium claims appears in Plaintiffs' response to Bankers Standard's motion for summary judgment.  *See* Pls.' Resp. to Defs.' Mtn. for Summ. J., at 17–18 (Dckt. No. 82).  There, Plaintiffs argue that Ellen and Ronald Saslow could both recover (at least) $500,000 each – less than the $879,832.23 received from Berry Brothers Firewood.  *Id.* at 17.

Bankers Standard disagrees.  In its view, Ellen Saslow's loss of consortium claim is derivative of Ronald Saslow's claim.  *See* Def.'s Reply in Supp. of Def.'s Mtn. for Summ. J., at 5–6 (Dckt. No. 88).  As Bankers Standard sees things, a recovery for loss of consortium comes out of the same bucket as the recovery for a direct injury.  *Id.* at 6.  That's correct.

---

[10]  The Court declines to address the "novel" legal issue teed up by the parties – namely, whether a single liability limit can be applied separately to two tortfeasors from the same car.  The facts in the case at hand don't support a finding that Bredeson was uninsured.  So, the Court can resolve this case on the facts, without touching on an undecided area of law.

In Illinois, a loss of consortium claim is viewed as a derivative injury. It is "subject to the same per-person limits as the bodily injury underlying the loss of consortium claim." *Schweighart v. Standard Mut. Ins. Co.*, 591 N.E.2d 121, 122 (Ill. App. Ct. 1992); *see also Martin v. Illinois Farmers Ins.*, 742 N.E.2d 848, 857 (Ill. App. Ct. 2000) ("Illinois cases . . . hold that loss of consortium is a derivative claim to the direct injury that causes it and as a result, is generally included and subject to the policy limitations for bodily injury to one person.") (collecting cases); *Illinois Farmers Ins. Co. v. Marchwiany*, 838 N.E.2d 172, 177 (Ill. App. Ct. 2005), *aff'd*, 856 N.E.2d 439 (Ill. 2006) (citing "an entire line of Illinois cases which have held that loss of consortium is a derivative claim to the direct injury that causes it and such claim is generally included and subject to the policy limitations for bodily injury to one person") (collecting cases).

In other words, a loss of consortium claim is generally treated as a hanger-on to a bodily injury claim. So, a loss of consortium claim will necessarily fail if the direct injury claim fails. And the loss of consortium claim is subject to the same policy limits as the bodily injury claim from which it derives. A recovery for the loss of consortium comes from the same pot of money as a recovery for the spouse's bodily injury.

An insurance policy *could* include language that separates a loss of consortium claim from the spouse's bodily injury claim. But Plaintiffs don't point to any language in the policy at hand that does so.

Plaintiffs argue that Illinois law assumes that the Saslows would split the $879,832.23 50-50 because settlements are treated as marital property. *See* Pls.' Resp. to Defs.' Mtn. for Summ. J., at 17–18 (Dckt. No. 82). They cite a statute that governs distribution of marital property. *Id.* at 17 (citing 750 ILCS 5/503). But a general statute about marital property does

not subvert the assumption, under Illinois insurance law, that a loss of consortium claim is derivate of a bodily injury claim.

At bottom, Plaintiffs don't offer a reason why the loss of consortium claim here should be treated separately from the bodily injury claim. So, the Court will apply the general rule. That is, the Court will treat the loss of consortium claim as derivative of the bodily injury claim. Therefore, the Court dismisses Counts VIII to XIV.

## IV.    Section 155 of the Illinois Insurance Code (Count I)

Count I is a claim under section 155 of the Illinois Insurance Code. *See* First Am. Cplt., at 3–6 (Dckt. No. 1-1); *see also* 215 ILCS 5/155. In a nutshell, Plaintiffs contend that Bankers Standard "unreasonably and vexatiously" refused to pay their claims in a timely fashion. *See* First Am. Cplt., at 6.

Section 155 of the Illinois Insurance Code allows an insured to recover attorneys' fees, costs, and statutory damages when the insurer's delay in settling a claim is "vexatious and unreasonable." *See* 215 ILCS 5/155. The statute provides:

> In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:
>
> (a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
>
> (b) $60,000;
>
> (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

*Id.*

Because section 155 is "penal in nature," its provisions are "strictly construed." *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000). Attorneys' fees are appropriate "only where the evidence shows that the insurer's behavior was willful and without reasonable cause." *Id.*

When deciding whether a delay is vexatious and unreasonable, a court must consider "the totality of the circumstances, taken in broad focus." *See Cook ex rel. Cook. v. AAA Life Ins. Co.*, 13 N.E.3d 20, 37 (Ill. App. Ct. 2014). "Neither the length of time, the amount of money involved, nor any other single factor taken by itself is controlling in determining if a delay is vexatious or unreasonable." *Id.* (quoting *Keller v. State Farm Ins. Co.*, 536 N.E.2d 194, 204 (Ill. App. Ct. 1989)); *see also Alassaf v. Travelers Cas. Ins. Co. of Am.*, 2014 WL 2978502, at *4 (N.D. Ill. 2014) ("[U]nder Illinois law, delay by itself is insufficient to support a claim under § 155[.]").

Instead, "[i]t is the attitude of the defendant which must be examined." *Keller*, 536 N.E.2d at 204. Other relevant factors include "whether the insured was forced to file suit to recover, and whether the insured was deprived of the use of its property." *Cook*, 13 N.E.3d at 37 (quoting *Mobil Oil Corp. v. Md. Cas. Co.*, 681 N.E.2d 552, 558 (Ill. App. Ct. 1997)). A court can also consider "whether there is a *bona fide* dispute concerning coverage, the extent of the insurance company's evaluation and investigation of the claim, and the adequacy of communications between the insurance company and the insured." *Id.*

Here, Plaintiffs' section 155 claim is based on the delayed payments of medical expenses coverage to Saslow and Spencer.

Plaintiffs' counsel submitted claims for medical expenses for Saslow and Spencer in April 2021. *See* Def.'s Statement of Facts, at ¶ 53 (Dckt. No. 71). But Plaintiffs did not receive

payment for those expenses until August 2021. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶¶ 28–29 (Dckt. No. 80). Plaintiffs waited four months.

As Bankers Standard sees things, Plaintiffs have failed to point to any evidence of "culpable conduct" on its part, apart from a delay in payment. *See* Def.'s Mem. in Support of Def.'s Mtn. for Summ. J., at 21 (Dckt. No. 70).

Plaintiffs point out that they received payment only after they filed a section 155 action against Bankers Standard. *See* Pls.' Mem. in Support of Pls.' Mtn. for Summ. J., at 19 (Dckt. No. 72-1). Additionally, Plaintiffs point to language in the auto policy, which provided that Bankers Standard would provide payment "within sixty days after we receive your sworn proof of loss." *Id.* at 21 (citing Auto Policy, at 46 (Dckt. No. 1-1)).

To be sure, Plaintiffs are correct that payment from Bankers Standard took longer than Bankers Standard said it would. Nonetheless, Bankers Standard points out that its internal records show that it attempted to pay $55,678.01 to Spencer, and $100,000 to Saslow, on June 8, 2021 – within 60 days of receiving the medical bills. *See* Def.'s Mem. in Support of Def.'s Mtn. for Summ. J., at 20 (Dckt. No. 70). After Bankers Standard learned that Saslow and Spencer had not received payment, it stopped the old checks and issued new ones. *Id.* at 20–21.

Plaintiffs point out that Bankers Standard did not produce copies of checks made out to Saslow or Spencer (from before August 2021) in discovery. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 31 (Dckt. No. 80). But a failure to produce earlier-dated checks does not rebut Bankers Standard's explanation – *i.e.*, that it attempted to issue the checks in June 2021, but its attempt failed. That testimony is unrebutted.

Besides, while Bankers Standard did not produce any checks themselves, it offered other evidence about the checks. The insurer produced its financial log and internal claim notes

explaining the June 2021 problem with issuing the checks. *See* Def.'s Statement of Facts, at ¶¶ 56–59 (Dckt. No. 71). David Updegraff, the adjuster for Bankers Standard, and Updegraff's supervisor, Keith Parry, both testified that the company attempted to make payments in June 2021, too. *Id.* at ¶¶ 60–62.

The record supports a conclusion that Bankers Standard made a mistake. When it learned about the mistake, it fixed it.

True, Plaintiffs had to wait longer than they expected. It goes without saying that no one wants to wait a few extra months for tens of thousands of dollars. After filing a claim with their insurer, an insured wants to get paid sooner rather than later.

Plaintiffs got paid in four months, not two months, so they had to wait longer than they should have waited. That's a delay, but it's not much of a delay. And standing alone, a delay is not a sufficient basis for a finding of culpability. The record could not support the notion that Bankers Standard dragged its feet intentionally.

Still, apart from the delay, nothing in the fact pattern at hand suggests that Bankers Standard acted unreasonably and vexatiously when handling Saslow's $100,000 payment and Spencer's $55,678.01 payment. A delay on its own isn't enough, so Plaintiffs' section 155 claim doesn't have a leg to stand on. *See Alassaf*, 2014 WL 2978502, at *4.

On this record, after drawing all reasonable inferences in Plaintiffs' favor as the non-movants, no reasonable jury could find that conduct "vexatious and unreasonable." *See* 215 ILCS 5/155. Therefore, Plaintiffs' section 155 claim is dismissed to the extent that it involves the $55,678.01 payment to Spencer and the $100,000 payment to Saslow that Plaintiffs received in August 2021.

Bankers Standard's arguments about section 155 end there. But Plaintiffs make additional arguments in favor of their section 155 claim.

For starters, Plaintiffs argue that Bankers Standard unreasonably and vexatiously waited until May 2022 to issue a $33,850 payment to Spencer, even though it had everything it needed to process those claims by June 2021. *See* Pls.' Resp. to Def.'s Mtn. for Summ. J., at 25 (Dckt. No. 82). Bankers Standard does not respond to this argument. *Cf.* Def.'s Reply in Supp. of Def.'s Mtn. for Summ. J., at 17–19 (Dckt. No. 88) (failing to address Plaintiffs' argument about the delay of the $33,850 payment to Spencer).

In a similar vein, Plaintiffs contend that Bankers Standard hasn't paid Spencer $100,000 in medical expenses, despite acknowledging receipt of records that "would support the full $100,000 payment" back in June 2021. *See* Pls.' Resp. to Def.'s Mtn. for Summ. J., at 25 (Dckt. No. 82). Bankers Standard does not respond to this argument. *Cf.* Def.'s Reply in Supp. of Def.'s Mtn. for Summ. J., at 18 (Dckt. No. 88) (not addressing Plaintiffs' argument about Spencer having not received the full $100,000 owed to her).

Bankers Standard might have a reasonable, nonvexatious explanation for why the $33,850 payment was so delayed. It might have a reasonable, nonvexatious explanation about why Spencer hasn't received $100,000 to cover her medical expenses, too.

Still, Bankers Standard hasn't offered an explanation, and Plaintiffs have asserted a significant delay. Therefore, Plaintiffs' section 155 claim survives as to the delay of the $33,850 payment to Spencer and Bankers Standard's failure to pay Spencer the full $100,000 owed.

In sum, the Court denies Plaintiffs' motion for summary judgment on their section 155 claim. The Court grants in part and denies in part Defendants' motion for summary judgment on the section 155 claim.

Specifically, Plaintiffs' section 155 claim is dismissed to the extent that Plaintiffs argue that Bankers Standard unreasonably and vexatiously delayed payments of medical expenses to Saslow and Spencer from April 2021 to August 2021 (meaning, the $100,000 payment to Saslow and the $55,678.01 payment to Spencer). Plaintiffs' section 155 claim survives to the extent that Plaintiffs argue that Bankers Standard did not timely pay $33,850 to Spencer for her medical expenses. The claim also survives to the extent that Plaintiffs argue that Spencer still has not received the full $100,000 of medical expenses coverage.

## Conclusion

For the reasons explained above, Defendant's motion for summary judgment is granted in part and denied in part. Defendant's motion for summary judgment is granted, except for the claim under the Illinois Insurance Code as stated in the preceding paragraph. Plaintiffs' motion for summary judgment is denied.

Date:  September 26, 2024

_____
Steven C. Seeger
United States District Judge